UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.

RUSSELL EUGENE GILMORE, and
RICHARD DAVID HEMSLEY,

                    Defendants.

No.  2:13-cr-00300-GEB

**ORDER RE DEFENDANTS' MOTIONS TO
EXCLUDE RECORDED STATEMENTS**

          Defendant  Russell  Gilmore  ("Gilmore")  and  Defendant
Richard Hemsley ("Hemsley") each move to exclude their recorded
statements, arguing the statements were obtained in violation of
Miranda v. Arizona, 384 U.S. 436 (1966). Each defendant contends
his  motion  should  be  granted  because  he  was  subjected  to  a
custodial interrogation that was not preceded by required Miranda
warnings. (Gilmore Mots. in Limine ("Gilmore MILs") 1:21-23, ECF
No.  100;  Hemsley  MIL  1:14-19,  ECF  No.  105.)  Gilmore's  motion
concerns  two  recorded  statements  he  gave,  and  Gilmore  makes  an
alternative  motion  should  his  suppression  motion  be  denied.
Gilmore argues:

          Neither  of  Mr.  Gilmore's  recorded  statements
          should  be  admitted  into  evidence.  Mr.
          Gilmore's  first  statement  was  taken  when  he
          was  in  custody  and  absent  advisals  required
          by Miranda and its progeny. . . .

          Mr.  Gilmore  made  his  first  statement  on

1

September 7, 2012[,] at 1661 Storksbill Road in Pilot Hill, California, during the execution of a search warrant by the El Dorado Sheriff's Office – Western Eldorado Narcotics Enforcement Team ("WENET"). The Storksbill Road property is remote and sits several miles from the nearest regularly maintained road. Seven law enforcement officers as well as an El Dorado County Code Enforcement Officer were involved in the search. The first person they encountered on the property was Mr. Gilmore. . . . During the search, the law enforcement officers encountered co-defendants John Mahan and Richard Hemsley. (Ex. A [Bates 1068-[]73.]) As Detective St. Pierre wrote in a report a day later, "All three males [Gilmore, Mahan and Hemsley] **were detained** on the top of the property where I contacted Gilmore." (Ex. A [Bates 1068-[]73] (emphasis added).) Detective St. Pierre then requested that Detective Palmberg question . . .Gilmore.[] (Ex. C [Bates 1075-77] . . . .) Detective Palmberg recorded his interrogation of Mr. Gilmore while they sat on the tailgate of Detective Plamberg's [sic] truck. (<u>Id.</u>) . . . [T]here is no statement on the recording regarding non-arrest or being free to leave. Detective Palmberg failed [to] provide <u>Miranda</u> advisals to Mr. Gilmore. (Ex. B [Gilmore Declaration.]) The law enforcement officers then transported Mr. Gilmore and the other defendants to El Dorado County Jail. (Ex. A [Bates 1068-73].)

On these facts, Mr. Gilmore was subject to custodial interrogation without <u>Miranda</u> advisals. . . .

    . . . .

Mr. Gilmore's second statement should also be excluded as the unlawful fruit of the first. Mr. Gilmore made his second recorded statement on December 18, 2013, during his transportation by law enforcement personnel to federal court. While he did receive <u>Miranda</u> warnings prior to providing the second statement and apparently signed a waiver of his rights, the second statement could not have been obtained without the first. That is because the first statement provided the purported justification for Mr. Gilmore's arrest and prosecution, and his second statement stemmed from that same

2

1   prosecution.

2   (Gilmore MILs 2:11–6:16 (footnotes omitted).)

3   Hemsley similarly contends:

On September 7, 2012, following a report of
illegal drug activity and the execution of
search warrant at 1661 Storksbill Road in El
Dorado County, and the discovery of a
marijuana garden there, the three defendants,
including Hemsley, were approached by law
enforcement. According to a report prepared
by one of the officers, all three were
"detained" and not permitted to leave.
Hemsley, as well as the others, were
interviewed. The conversation was recorded.
Hemsley was not Mi[r]andized. Although
Hemsley was specifically told that he could
"terminate questioning at anytime [sic]," he
was not told that he was free to leave at any
time. Following the interview, Hemsley was
taken to the El Dorado County jail. On these
facts, the interrogation was clearly
custodial in nature, and thus unlawful, in
the absence of Miranda warnings, of which
there were none.

15   (Hemsley MIL 1:20–2:7 (citation omitted).)

16   The government opposes each motion, rejoining "neither

17  defendant was in the 'custody' of law enforcement at the time

18  they were interviewed so Miranda did not apply." (Gov't Opp'n to

19  Defs.' MILs 2:2–4, ECF No. 120.) The government argues, *inter*

20  *alia*:

The United States agrees that both Gilmore
and Hemsley were initially detained when the
search team entered the property to be
search[ed] and conducted their protective
sweep of the large rural forested property as
allowed by law. However, after approximately
30 minutes[1] of searching the property for
suspects and weapons, the search team
determined . . . the need to detain the
suspects no longer existed. After making that

---

[1]   The government clarifies in its post-evidentiary hearing brief that the
protective sweep concluded "approximately 11 minutes after the arrival of law
enforcement at the Storksbill Road property." (United States' Opp'n to Defs.'
Mots. to Exclude Statements 9:25–26, ECF No. 168.)

determination, the search team de-escalated the situation by not restraining any suspect . . . .

. . . .

[The record] prove[s] that both defendants were not in custody during their respective interviews. Their earlier detentions during the security sweep were over. . . . Each defendant was informed that he did not have to talk to the officer. Neither defendant was restrained physically or by threats. The interviews were short, low-keyed and conducted with only one officer in surroundings familiar to the defendants. Neither defendant asked to leave or terminate the interviews. Neither Gilmore nor Hemsley w[as] in custody for purposes of Miranda.

(Id. at 7:11-21, 10:9-18 (citations omitted).)

Gilmore replies, *inter alia*:

While the government seeks to divide Mr. Gilmore's encounter with law enforcement into two phases, the first where he was detained and the second where he was free to leave, there is an absence of meaningful evidence to show such a distinction. Rather, the government rests on a premise that the second part of the encounter was "de-escalated." But . . . even if the Court were to credit the government's recounting of events, the making of a few off-hand statements would not overcome the otherwise custodial atmosphere.

(Gilmore Reply 5:19-28, ECF No. 124.)

## I.  LEGAL STANDARD

The Ninth Circuit explains Miranda in United States v. Craighead, 539 F.3d 1073, 1082 (9th Cir. 2008), as follows:

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In Miranda v. Arizona, the Supreme Court adopted prophylactic procedural measures to guarantee that a suspect is advised of his Fifth Amendment rights before custodial interrogations. 384 U.S. 436, 444-45 (1966).

4

These protections are constitutional in nature.

"An officer's obligation to give a suspect <u>Miranda</u> warnings before interrogation extends only to those instances where the individual is 'in custody.'" <u>United States v. Kim</u>, 292 F.3d 969, 973 (9th Cir. 2002) (citation omitted). "[W]hether a suspect is 'in custody' is an objective inquiry." <u>J.D.B. v. North Carolina</u>, 131 S. Ct. 2394, 2402 (2011). The "in custody" focus is "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994). Therefore, "[t]he test . . . involves no consideration of the actual mindset of the particular suspect subjected to police questioning. The benefit of the objective custody analysis is that it is designed to give clear guidance to the police." <u>J.D.B.</u>, 131 S. Ct. at 2402 (citations and internal quotation marks omitted).

The Ninth Circuit states:

> In cases . . . in which the suspect has not formally been taken into police custody, a suspect is nevertheless considered "in custody" for purposes of <u>Miranda</u> if the suspect has been deprived of his freedom of action in any significant way. To determine whether the suspect was in custody, we first examine the totality of the circumstances surrounding the interrogation. We then ask whether a reasonable person in those circumstances **would have felt he or she was not at liberty to terminate the interrogation and leave**. Accordingly, taking into account the totality of the circumstances, we must decide whether a reasonable person in [the suspect]'s position would have felt deprived of his freedom of action in any significant way, **such that he would not have felt free to terminate the interrogation**.

Applying this standard to an interrogation conducted within the [suspect's abode] presents some analytical challenges . . . The usual inquiry into whether the suspect reasonably believed he could "leave" the interrogation does not quite capture the uniqueness of an interrogation conducted within the suspect's [abode]. . . . **[A] reasonable person interrogated inside his own [abode] may have a different understanding of whether he is truly free "to terminate the interrogation" if his [abode is in a remote property located several miles from the nearest regularly maintained road and has present on the premises] . . . law enforcement agents conducting a warrant-approved search.** He may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his [abode] of his interrogators until they have completed their search. We must, therefore, consider how to apply the traditional <u>Miranda</u> inquiry to an in-[abode] interrogation.

An interrogation conducted within the suspect's [abode] is not *per se* custodial. On the contrary, courts have generally been much less likely to find that an interrogation in the suspect's [abode] was custodial in nature. The element of compulsion that concerned the Court in <u>Miranda</u> is less likely to be present where the suspect is in familiar surroundings. Nevertheless, an interrogation in the suspect's [abode] may be found to be custodial under certain circumstances. . . .

. . . .

[W]hen applying <u>Miranda</u> to the task of sorting a non-custodial in-[abode] interrogation from a custodial one, our analysis considers the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the [abode] into a "police-dominated atmosphere."

. . . .

The determination of whether an in-[abode] interrogation was custodial is necessarily fact intensive. . . . [S]everal factors are relevant to whether the circumstances of [the suspect]'s interrogation effected a police-

dominated atmosphere: (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made.

Craighead, 539 at 1082-84 (emphasis added) (footnote, citations, and internal quotation marks omitted).

## II.  DISCUSSION

"On September 7, 2012, [Sergeant Robert St. Pierre ('St. Pierre')] led a law enforcement team [consisting of seven law enforcement officers] in the service of a search warrant at [the rural property at 1661 Storksbill Road, in Pilot Hill, El Dorado County, California (the 'property') that was]" suspected to be a marijuana cultivation site. (St. Pierre Decl. ¶ 2, ECF No. 120, ECF pp. 31–35; see also St. Pierre Case Narrative 1, ECF No. 105, ECF pp. 6–12; Tr. 13:1–8, ECF No. 168-1.) Additionally, an El Dorado Code Enforcement Officer was with the team since he had been on the property before. (St. Pierre Case Narrative 1.)

"Upon entering the property, [St. Pierre] found defendant Russell Gilmore camped in an area that appeared to serve as a lookout post alongside a road that led approximately 100 yards further to a marijuana garden on United States Bureau of Land Management property. [St. Pierre] assigned an officer in the search team to detain Gilmore as the search team conducted a security sweep of the large rural property and area for suspects and weapons. During the service of the search warrant, officers conducted a security sweep for suspects and weapons, and detained

three suspects -- Russell Gilmore, Richard Hemsley, and John Mahan to render the search area safe. [St. Pierre declares:] Our guns were drawn upon arrival at the property searched and [during the] initial detention due to officer safety concerns as we had been told by a reliable tipster that people growing marijuana on the property had firearms." (St. Pierre Decl. ¶ 2; see also St. Pierre Case Narrative 1; Tr. 60:22–61:1, 66:11–12.)

"After . . . [eleven[2]] minutes of searching the property for suspects and weapons, the search team . . . determined that [Mahan, Gilmore, and Hemsley] were unarmed, isolated from . . . eight firearms . . . found on the property, and [were] no longer . . . an imminent, realistic threat to the search team." (See St. Pierre Decl. ¶ 3; Tr. 22:8–11, 63:22–23.) "Consequently, the need to detain the[m] . . . no longer existed. After making that determination, the search team . . . [did] not restrain[] . . . Gilmore, Hemsley and/or Mahan by: (1) any physical restraints, such as handcuffs; (2) any verbal warnings or threats; and/or (3) any threats by brandishing or pointing of firearms or weapons." (St. Pierre Decl. ¶ 3; e.g., Tr. 75:17–18 (discussing Gilmore's interview), 23:20–24 (discussing Hemsley's interview).)

Subsequently, Gilmore, Hemsley, and Mahan were each interviewed on the property. (St. Pierre Case Narrative 1–5.)

A.   Russell Gilmore

Gilmore was the first person seen on the property by

---

[2]   St. Pierre initially declared that it took thirty minutes to render the property safe. However, at the evidentiary hearing concerning the motions, he testified it actually took eleven minutes, based on his review of the Call for Service (CFS) Report and the time stamps therein. (Gov't Ex. 4; Tr. 20:13–16, 22:8–11.)

the search team. (Palmberg Decl. ¶ 2; Gilmore Decl. ¶ 2, ECF No. 100-2, Tr. 17:8-10.) He "was on his cot at the camp [he] kept at the top of the property." (Gilmore Decl. ¶ 2; see also St. Pierre Case Narrative 1; Palmberg Decl. ¶ 2.) Gilmore was living on the property at the time. (Palmberg Suppl. Narrative 2.) Following the officers' entry onto the property, one of the officers contacted Gilmore; Gilmore identifies this officer as St. Pierre. St. Pierre told Gilmore: "sit right there, don't go anywhere." (Gilmore Decl. ¶ 3.) "A short time later, a [second] law enforcement officer . . . escorted [Gilmore] to another part of the top of the property . . . next to the pump house." (Id.; see also St. Pierre Decl. ¶ 2.) The officer who Gilmore identifies as St. Pierre told the second law enforcement officer to "keep an eye on [Gilmore]." (Gilmore Decl. ¶ 3; see also St. Pierre Decl. ¶ 2 (St. Pierre declares: "I assigned an officer . . . to detain Gilmore . . . .."); Tr. 18:7-12.) The second officer "kept [Gilmore] next to the pump house for about 30 minutes." (Gilmore Decl. ¶ 3.)

Gilmore declares that the second officer was "carrying what appeared to be an AK-47 automatic firearm" when he escorted Gilmore to the pump house. (Gilmore Decl. ¶ 3.) However, St. Pierre avers this statement "is wrong" because St. Pierre "know[s] that the El Dorado County Sheriff's Department does not issue AK-47 rifles[,] and the few select SWAT team members who are issued automatic firearms were not present during the service of the search warrant that day." (St. Pierre Decl. ¶ 8; Tr. 32:1-7 (testifying there were no automatic weapons or AK-47 rifles at the property that day).)

9

After St. Pierre completed his interview with Mahan, St. Pierre asked Palmberg to "speak to Gilmore to obtain his statement." (Palmberg Decl. ¶ 3; Tr. 22:19-25.) St. Pierre then began to interview Hemsley. (Tr. 22:24-23:1.)

Palmberg approached Gilmore with his firearm holstered and observed he was physically unrestrained and appeared "calm, relaxed." (Tr. 69:15-17.) Nobody was in the immediate interview area, and Palmberg "would say" the interview was "10 to 15 minutes" long. (Tr. 70:20-21.) Palmberg "recall[s] that [he] conducted the interview in a one-on-one atmosphere with Gilmore and [him] alone[,] in a very low key fashion. . . . [O]ther officers present were approximately 30-45 feet away performing other duties . . . Gilmore sat out in the open on the tailgate of [Palmberg's] truck and appeared to be very comfortable during the interview. . . . [Palmberg] did not restrict Gilmore's movements in any fashion during the interview." (Palmberg Decl. ¶ 4.) Palmberg conducted an audio recording of a portion of the interview, and "do[es] not know why [his] audio recorder did not capture [his] initial contact with Gilmore." (Palmberg Decl. ¶ 5.) During the communication Palmberg told Gilmore, "So if you want, Russell, just talk about why you're here at this property out here at Pilot Hill." (Ex. 5B Gilmore Interview Tr. 2:12-14.)) At some point during the contact, Palmberg also told Gilmore: "You don't have to talk to me if you don't want." (Gilmore Decl. ¶ 4.) Palmberg did not tell Gilmore "that [he] was free to leave," (id.); however, the uncontroverted evidence establishes Palmberg "clarified with Gilmore" before the interview "that [Gilmore] understood he was not under arrest." (Palmberg Decl.

1    ¶ 3; see also Palmberg Suppl. Narrative 2.) Palmberg declares:

> I do not know the exact words that I used,
> but usually, but not always, in these
> circumstances I explain that law enforcement
> personnel are on the property for the service
> of a search warrant and that people are only
> being detained until the scene can be
> secured. At the time of the interview, the
> search warrant scene had been secured and
> rendered safe. I typically then explain to
> the persons I am speaking with that they are
> not under arrest and I clarify with them that
> they understand they are not under arrest. At
> this time, I do not recall if I used the word
> detained or not during my contact with
> Gilmore.

(Palmberg Decl. ¶ 3.) Gilmore avers that he does not "remember

[Palmberg] ever saying that [he] was not under arrest or anything

of that nature." (Gilmore Decl. ¶ 4.) However, this averment is

insufficient to controvert Palmberg's direct evidence on the

issue. See Blanford v. Sacramento Cty., 406 F.3d 1110, 1113 n.3

(9th Cir. 2005) (finding that Plaintiff's averments that he did

not remember whether or not he stopped on the street and raised

the sword he was holding and made a growling or roaring sound was

insufficient evidence to controvert the deputies' accounts that

this occurred).

During the recorded interview, Palmberg asked Gilmore

questions concerning, inter alia, why he was on the property;

what Mahan asked him to do on the property; whether Mahan asked

Gilmore to act as a guard; if Mahan told him why he needed to act

as a guard; what Mahan told him he would be paid for his

services; what his understanding was concerning when he would be

paid; his understanding concerning how Mahan makes money; his

understanding concerning the value of marijuana; the quantity of

marijuana that would be harvested from the crop; whether he

understood he would be paid from profits from the sale of the marijuana; whether Mahan told Gilmore he needed to be armed as a guard; what Mahan instructed Gilmore to do if someone entered the property; whether Mahan asked him to stay at the entrance to the property where he was camped; and Gilmore's involvement in watering the marijuana plants. (Gov't Ex. 5a Gilmore Interview Recording.) At the conclusion of the interview, Palmberg suggested they move to a spot in the shade. (Id.) Palmberg stated: "Okay. Let's go back over to your cot, and we'll just hang out in the shade over there so I can talk to all of these guys and we can get out of your hair, alright?" (Id.) Palmberg testified at the evidentiary hearing that he "believe[d]" he "physically walk[ed] away from" Gilmore after the interview, and "believe[d] [Gilmore] stayed near the cot in the shade." (Tr. 74:6-14.) He also testified he "went on to . . . collect the rest of the evidence at the location." (Tr. 74:16-17.)

Concerning the Craighead factors, although Gilmore was initially detained when the officers engaged in the task of ensuring that the rural property was safe for the ensuing search, that detention ended by the time Palmberg contacted Gilmore for the interview, which Palmberg conducted in a low-key fashion, and during which he did not restrict Gilmore's movements in any fashion.

Seven armed law enforcement officers and a code enforcement officer assisted with the search of the property, which totaled 40 acres. Only Palmberg was in the immediate interview area, and other officers near that portion of the property were approximately 30-45 feet away from the interview

location and were performing other duties unrelated to Gilmore's interview. The interview occurred in the open air near the cot on which Gilmore slept. Therefore, "[u]nlike in Craighead, where a detective had his back to the closed door and block[ed] the suspect's only route out of [a] storage room, [Gilmore] was not similarly restrained," and the interview was conducted in surroundings familiar to Gilmore. United States v. Young, 622 F. App'x 694, 695 (9th Cir. 2015) (citation omitted). Accordingly, "a reasonable person in [Gilmore]'s position would not have felt that he [or she] was being isolated from those who could provide moral support." Id. (citation omitted).

In light of the circumstances involved with the interview, a reasonable person in Gilmore's position would not have felt he or she had to respond to Palmberg's questions. Palmberg indicated to Gilmore that it was his decision whether he wanted to talk to him, and the interview was relatively brief, lasting approximately fifteen minutes. In addition, most of Palmberg's tone was conversational and non-confrontational during the interview; however, Palmberg used a somewhat confrontational tone in a portion of the interview. (See Ex. 5B Gilmore Interview Tr. 10:24–11:7.) But Palmberg's tone was not forceful, and even weighing that portion of the interview in Gilmore's favor is not dispositive and does not require finding that Gilmore gave his statements in a police-dominated atmosphere. Therefore, a reasonable person in Gilmore's situation would understand that he or she could have discontinued all or part of the interview at any time.

Therefore, Gilmore's motion to suppress his

1    September 7, 2012, interview is DENIED. Since Gilmore was not in

2    custody, and therefore not entitled to a <u>Miranda</u> warning, on

3    September 7, 2012, his second statement on December 18, 2013, is

4    not fruit of the poisonous tree. Therefore, this portion of

5    Gilmore's motion is also DENIED.

6         Gilmore also makes an alternative motion for "an order

7    that the entirety of his recorded statements be admitted into

8    evidence and played for the jury, should the government introduce

9    portions of those statements." (Gilmore MILs 1:24-26.) However,

10   this motion lacks sufficient factual context for a ruling since

11   the government has not yet sought admission of any statement.

12   Therefore, Gilmore's alternative motion is DENIED.

13        **B.   Richard Hemsley**

14        Hemsley's interview was also conducted on the property.

15   Hemsley was found in the area of a marijuana garden [on the

16   property near] a travel trailer." (Palmberg Decl. ¶ 2; <u>see also</u>

17   Palmberg Suppl. Narrative 1.) Hemsley was living on the property

18   part-time and was preparing to take a shower. (St. Pierre Decl.

19   ¶ 4; <u>see also</u> Hemsley Decl. ¶ 1 ECF No. 132, ECF pp. 21-24; St.

20   Pierre Case Narrative 4; Hemsley Interview Tr. 10:4-12, ECF No.

21   132, ECF pp. 3-19.)

22        "[A]t least two . . . vehicles drove down the hill"

23   toward Hemsley's location. (Hemsley Decl. ¶ 1.) "One of the

24   officers told [Hemsley] to get on the ground. [That officer] had

25   a weapon drawn[,] and [Hemsley] did as [he] was told." (<u>Id.</u> ¶ 2.)

26   "Two officers . . . approached [Hemsley] and one of them placed

27   [Hemsley] in handcuffs while [he] was on the ground." (<u>Id.</u> ¶ 3;

28   <u>see also</u> Palmberg Suppl. Narrative 1.)

1    "One of the officer[s] entered the [trailer] and
2    confirmed there were no other persons in that part of the
3    premises." (Hemsley Decl. ¶ 4; see also Palmberg Suppl. Narrative
4    1.) "The other officer . . . placed [Hemsley] in the patrol car.
5    As he sat [Hemsley] in the car, [Hemsley] explained to [the
6    officer] that [he] was scheduled to pick up [his] daughters . . .
7    in Chico and needed to call [his] family." (Hemsley Decl. ¶ 5.)
8    The officer "refused to permit [Hemsley] to do so." (Id.) "After
9    sitting in the patrol car approximately 20 minutes, the . . .
10   officer drove the car . . . back to the top of the property where
11   [Hemsley] saw [Mahan] and [Gilmore] . . . ." (Id. ¶ 6; see also
12   St. Pierre Case Narrative 1 ("All three males were detained on
13   the top of the property where [St. Pierre] contacted Gilmore.").)
14   "After a few minutes . . . , the officer . . . remove[d Hemsley]
15   from the patrol car." (Hemsley Decl. ¶ 7.) Hemsley requested to
16   "hav[e] the [hand]cuffs loosened," and "St. Pierre then
17   instructed the officer to 'just remove the [hand]cuffs[,]' which
18   he did." (Id.) "Shortly after stepping out of the patrol car,
19   [Hemsley] was asked to have a seat near the van, separate from
20   the others by about 10 feet." (Id. ¶ 8.)

21       St. Pierre then conducted the interview of Hemsley "in
22   a . . . non-coercive fashion," and St. Pierre's firearm was
23   holstered. (St. Pierre Decl. ¶¶ 4, 5; see also Hemsley Decl. ¶ 8;
24   St. Pierre Case Narrative 3.) "At no time was [Hemsley] told that
25   [he] was free to leave[,]" (Hemsley Decl. ¶ 10), but before the
26   interview, St. Pierre "told [Hemsley] he was not under arrest and
27   that he was free to terminate questioning at any time." (St.
28   Pierre Case Narrative 3; see also St. Pierre Decl. ¶ 4.) St.

1   Pierre "told [Hemsley] that [the officers] were there for a

2   search warrant, that he was not under arrest, that he did not

3   have to answer questions if he didn't want to or he could

4   terminate questioning at any time." (Tr. 24:1-7.) Hemsley avers

5   that he "do[es] not recall [St. Pierre] telling [him] that [he]

6   did not have to answer his questions," (Hemsley Decl. ¶ 10);

7   however, this averment is insufficient to controvert St. Pierre's

8   direct averments on the issue.

9       "Hemsley was [questioned just over 14 minutes] under a

10  shade umbrella near Gilmore's parked box[,]" and the interview

11  was conducted in a "one-on-one atmosphere with Hemsley and [St.

12  Pierre] alone in plain sight." (St. Pierre Decl. ¶ 5; Tr. 23:18-

13  19.) St. Pierre "did not restrict Hemsley's movements in any

14  fashion during the interview." (St. Pierre Decl. ¶ 5.) During the

15  interview, "[t]he other officers [in interview area of the

16  property] were approximately 30-45 feet away performing other

17  duties in connection with the search of the property and/or

18  interview of other suspects." (Id.)

19      St. Pierre recorded Hemsley's interview; however, St.

20  Pierre started the recording after the questioning began. (Id.

21  ¶¶ 6-7; see also Hemsley Interview Tr. 2.) Hemsley's interview

22  lasted approximately fifteen minutes. (St. Pierre Decl. ¶ 6.)

23  During the interview, St. Pierre asked Hemsley "Can I talk to you

24  about this property?" Hemsley immediately responded: "I know -- I

25  know that it's on Storksbill. I know the gate code to get in. And

26  I know there's 40 acres here." (Gov't Ex. 6a Hemsley Interview

27  Recording.)

28      St. Pierre's communication with Hemsley was conducted

16

in a casual, non-coercive manner, and the record does not support finding that when the interview occurred, it was conducted in a police-dominated atmosphere. It was conducted on the 40 acres of property that was Hemsley's abode. In addition, before the interview, St. Pierre "told [Hemsley] he was not under arrest and that he was free to terminate questioning at any time." (St. Pierre Case Narrative 3; see also St. Pierre Decl. ¶ 4.) The interview was "relatively short, approximate[ly] 15-minute[s]," and "Hemsley volunteered and readily admitted his role in growing the marijuana plants at the property searched, the amount of work that he invested into the marijuana garden, and . . . [he] never appeared distressed or pressured in talking to [St. Pierre]." (St. Pierre Decl. ¶ 6.) Although Hemsley had told another officer earlier that he wanted to call his family about picking up his daughters, (Hemsley Decl. ¶ 5), there is no indication that St. Pierre was aware of that earlier-made request or that Hemsley still desired to make the call at the time of the interview. (See Tr. 32:10-14.)

The recording confirms that a reasonable person in Hemsley's position would have understood he or she did not have to respond to any question. The tone of the interview was causal, non-confrontational, and Hemsley did not appear to be frightened or intimidated. See United States v. Bassignani, 575 F.3d 879, 884-85 (9th Cir. 2009) (referencing a recording when considering whether or not the interview was custodial). The recording evinces that the interview was conducted in a calm and courteous tone and that Hemsley participated actively in the communication, except for when St. Pierre told Hemsley that one question was a

1   "yes or no" question. (Hemsley Interview Tr. 11:11-12.) While

2   that single question weighs in Hemsley's favor, it is not

3   dispositive considering the entire communication. Therefore, by

4   the time St. Pierre interviewed Hemsley, a reasonable person in

5   Hemsley's position would have felt he or she was free to

6   terminate the interview.

7        For the stated reasons, Hemsley's interview was non-

8   custodial and <u>Miranda</u> warnings were not required. Therefore,

9   Hemsley's motion is DENIED.

10                       **III.   CONCLUSION**

11        For the stated reasons, each motion is DENIED.

12  Dated:  February 25, 2016

13

14                              _____

15                              GARLAND E. BURRELL, JR.
                                Senior United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

                                18